**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 19-7861**

————————

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

KEYON PAYLOR,

> Defendant - Appellant.

————————

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Ellen Lipton Hollander, Senior District Judge. (1:14-cr-00271-ELH-1)

————————

Argued: March 12, 2021                    Decided: December 15, 2023

————————

Before GREGORY and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

————————

Vacated and remanded by published opinion. Judge Thacker wrote the opinion in which
Judge Gregory and Judge Floyd joined.

————————

**ARGUED:** Debra Loevy, THE EXONERATION PROJECT, Chicago, Illinois, for
Appellant. Peter Jeffrey Martinez, OFFICE OF THE UNITED STATES ATTORNEY,
Baltimore, Maryland, for Appellee. **ON BRIEF:** Gayle Horn, THE EXONERATION
PROJECT, Chicago, Illinois, for Appellant. Robert K. Hur, United States Attorney,
Christina A. Hoffman, Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellee.

————————

THACKER, Circuit Judge:

Keyon Paylor ("Appellant") filed a petition pursuant to 18 U.S.C. § 2255, seeking to vacate his conviction for being a felon in possession of a firearm and asserting that his guilty plea was not knowing and voluntary. Specifically, Appellant contends that the law enforcement officers involved in his arrest planted the firearm and stole thousands of dollars from him and that his plea was induced as a result of egregious law enforcement misconduct. Appellant asserts that had he known about the rampant, widespread misconduct of now-disgraced Detective Daniel Hersl ("Detective Hersl"), he would not have pled guilty.

The district court denied Appellant's petition without providing discovery or an evidentiary hearing. Ironically, the district court held that Appellant did not produce enough evidence to establish that information regarding former Detective Hersl's misconduct materially influenced Appellant's decision to plead guilty.

For the reasons detailed herein, although we cannot conclude at this juncture that Appellant has produced evidence sufficient to establish that his guilty plea was not knowing and voluntary, we conclude that Appellant is entitled to discovery and an evidentiary hearing in order to attempt to gather such evidence. Accordingly, we vacate the district court's order and remand for discovery and an evidentiary hearing on Appellant's § 2255 petition.

I.

A.

<u>Arrest</u>

On January 2, 2014, four Baltimore police officers -- Detectives Hersl, John Burns, Timothy Romeo, and Jordan Moore -- arrested Appellant for being a felon in possession of a firearm. The officers aver that on the day of the arrest, they were in an unmarked car when they observed Appellant walking down the street. The officers claim that when Appellant noticed the officers, he quickened his pace, ran to the front porch of his residence, removed a black metallic object from the waistband of his pants, and placed it under the cushion of a chair on his front porch. The officers then pursued Appellant into his house, handcuffed him, and escorted him back onto the front porch. At that point, Detective Moore lifted up the seat cushion from the front porch chair and recovered a black, .45 caliber semi-automatic handgun. Detectives Romeo and Moore then proceeded to arrest Appellant.

B.

<u>Jail Phone Calls</u>

Since his arrest, Appellant has consistently disputed the officers' version of events and maintains that the officers planted the gun. Appellant also contends that while Detectives Romeo and Moore arrested him outside on the front porch, Detective Burns went upstairs to Appellant's bedroom, rummaged through his dresser drawers, and stole $4,000–$5,000 in cash.

Immediately following his arrest, Appellant made two phone calls to family members from a recorded jail phone. During these phone calls, Appellant relayed his version of the arrest to his family members. He discussed the "money that the police took," and told his sister how officers dug through his dresser drawers and stole thousands of dollars in cash, yet only reported that they recovered $94. J.A. 1597, Call 1, at 4:46–5:56.[1] He alleged, "Hersl and them took my money" and "they went through my clothes and took my [expletive] money." *Id.* at 10:46. During this phone call, Appellant also noted that he had previously called his mother from the jail, and his mother told him that his money was not there and all of his clothes from his dresser were on the floor. *See id.* at 11:30–40.

C.

The Case Against Appellant

1.

On June 4, 2014, a grand jury indicted Appellant, charging him with one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Although four officers were present at Appellant's arrest, only Detective Hersl filed an arrest report documenting the law enforcement version of the events of January 2. Thus, the Government's case against Appellant hinged on Detective Hersl's account.

Notably, Appellant had prior experience with Detective Hersl. Appellant asserts that he knew Detective Hersl to be a dirty cop who had previously planted evidence on Appellant. According to Appellant, when Appellant was just 13 years old, Detective Hersl

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

stopped him, placed him in handcuffs, and put him in the back of a police car with another officer. After Detective Hersl searched the surrounding alleyways where he had stopped Appellant and failed to find any evidence of criminal activity, the officers began to drive away with Appellant still in the back of the police car. Detective Hersl's partner then opened the glove compartment of the police car and pulled out an envelope with 25 heroin pills. Appellant was then charged with possession of the drugs that were pulled from the glove compartment of the police car. But, Appellant went to trial and was acquitted.

Fast forward to the case at hand. In this case, Appellant filed a motion to suppress the gun he was charged with possessing, arguing that the evidence should be suppressed because the officers lacked reasonable suspicion or probable cause to search him or his home. To support his motion and in preparation for trial, Appellant sought discovery. In particular, in an attempt to demonstrate a pattern of corruption by Detective Hersl, Appellant made a request to the Government for "any and all Baltimore City Police Department/Justice Department/U.S. Attorney's Office files/records for all of the officers involved in the investigation and arrest of Keyon Paylor in search of any complaint of misconduct, civilian or departmental." J.A. 159. Appellant's request specified that the Government should "pay particular attention to any *allegation* of or involving official misconduct, excessive use of force, false statements, misrepresentations, stealing, misappropriation, or any dishonest act that could, at minimum, affect a fact-finder's evaluation of the credibility of the officer." *Id.* (emphasis in original). In response, the Government turned over 30 Internal Affairs Division ("IAD") files relating to complaints

against Detective Hersl for in camera review by the district court. After review, the district court allowed disclosure of only four and a half of the IAD files.

Ultimately, Appellant's defense counsel advised Appellant to plead guilty because counsel did not believe only four complaints were enough to establish a pattern of corruption by Detective Hersl in order to discredit his testimony about Appellant's arrest. *See* J.A. 179–80, Written Declaration by Brendan Hurson ("I knew that I was not given, and thus did not possess, sufficient information to mount a successful challenge to the officers' accounts of Mr. Paylor's arrest. Without concrete evidence of Det[ective] Hersl's willingness to lie under oath, I believed the Government's case against Mr. Paylor – which hinged entirely on witness credibility – was strong.").

As a result of the federal indictment, Appellant was facing a statutory maximum sentence of ten years (120 months) of imprisonment. Additionally, Appellant was on parole for a state offense for which he received a 15 year suspended sentence. As a result of the charge in the federal case, Appellant was also facing a reinstatement of the 15 year sentence for the state charge. Part of Appellant's plea deal with the Government here included an agreement that Appellant would receive time served for the pending violation in state court. And, not only would the potential 15 year state sentence be reduced to time served, Appellant would receive credit for a 60 month sentence on the federal charges -- quite a favorable resolution for Appellant.

2.

On April 21, 2015, Appellant pled guilty to being a felon in possession of a firearm as charged in the indictment. After Appellant took an oath to testify truthfully, the Government offered:

> THE GOVERNMENT: If this matter proceeded to trial, the government would prove the following facts beyond a reasonable doubt. The government would prove that on the 2nd of January, 2014, four officers of the Baltimore Police Department encountered Mr. Paylor while driving in an unmarked vehicle on 600 block of Bartlett Avenue in Baltimore City. Upon seeing the officers, Mr. Paylor ran up the stairs of 647 Bartlett Avenue. He then hopped the walls of two adjoining porches.
>
> When he reached the porch of 651 Bartlett Avenue, his residence, Mr. Paylor withdrew from his waistband a Heckler & Koch .45 caliber pistol bearing Serial Number 2509021. The pistol was loaded with nine rounds, one of which was in the chamber. After withdrawing the pistol from his waistband, Mr. Paylor placed it underneath a seat cushion on his front porch, where it was late[r] recovered by law enforcement. Mr. Paylor admits, Your Honor, that prior to January 2nd of 2014, he had been convicted of a crime punishable by imprisonment for a term exceeding one year and his civil rights had not been restored. Mr. Paylor further admits that the firearm and ammunition recovered from his residence were manufactured outside the State of Maryland and therefore affected interstate commerce.
>
> The firearm was examined and found to be capable of expelling a projectile by the action of an explosive. It was therefore a firearm as defined in 18 USC Section 921(a)(3). Similarly, the ammunition was examined and found to be ammunition as defined in 21 USC Section 921(a)(17). Your Honor, those are the facts the government would prove if this case went to trial.
>
> . . .
>
> THE COURT: Mr. Paylor, is that an accurate summary of the facts in this case?

THE DEFENDANT: Yes, ma'am.

THE COURT: Did you, in fact, commit the crime as summarized by the government?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you still wish to plead guilty?

THE DEFENDANT: Yes, ma'am.

THE COURT: Are you pleading guilty freely and voluntarily?

THE DEFENDANT: Yes, ma'am.

THE COURT: Are you pleading guilty because you are guilty as charged?

THE DEFENDANT: Yes, ma'am.

J.A. 49–50. In accordance with the plea agreement, Appellant was subsequently sentenced to 60 months of imprisonment to be followed by a three year term of supervised release.

### D.

### The Case Against Detective Hersl

Almost two years later, on February 23, 2017, a grand jury returned an indictment against Detective Hersl charging him and six other officers with numerous crimes, including racketeering, Hobbs Act robbery, and extortion spanning the time period between 2014 and 2016.

### 1.

As part of the ongoing case against Detective Hersl, on June 15, 2017, the Government questioned Appellant about the circumstances of his arrest as related to

8

Detective Hersl's criminal conduct. Immediately following the interview with Appellant, the Government presented Appellant's testimony under oath to the grand jury. Specifically, the Government offered the following testimony to the grand jury:

> THE GOVERNMENT: Now, when they came into your house on January 2nd, 2014, what did you observe Danny Hersl, Sgt. Burns, and any other officers do next?
>
> APPELLANT: Daniel Hersl came and the other two officers that was with him, they were searching me. And Sgt. Burns, he was upstairs in my room. He was searching my room, ripping my room apart, taking my drawers and stuff out.
> And then he must've found my money that I had in my drawer. He stepped out to the top of the steps and was looking at me and seeing me looking at him. Then he stepped back. And then he told the officer that went outside – they told him to bring me outside and put handcuffs on me.
>
> . . .
>
> THE GOVERNMENT: So 10 minutes after they had first interacted with you in your house, they bring you out onto the porch, and what happens next?
>
> APPELLANT: Well, they sat me on the porch and they asked why I was staring at them so hard, because I told them I -- trying to put -- like they did before. So they like, Man, don't say nothing. Then they went to the chair and lift up the chair cushion and -- he going to say. So first, I told him like, Man, that's not my gun, and then he going to say, Yeah, we just seen you put this right here.
> So I'm like, I ain't put nothing right there. The next thing you know, they put the rubber gloves on. He start unloading the gun on the porch, and then took his gun off his hip and put it together and put his gun back. He going to say this -- and then they call for the paddy wagon. They put me in the paddy wagon.

J.A. 1685–86; 1688.

Of note, the Government also elicited the following testimony from Appellant:

THE GOVERNMENT: So was it your understanding, Mr. Paylor, that if you went to trial in this case, had a trial, Danny Hersl, Sgt. Burns, and others may testify, and that if you were convicted you could get somewhere close to 15 years of prison time?

APPELLANT: Yes.

THE GOVERNMENT: And as a result of that, did you -- is that why you pled guilty to this case?

APPELLANT: I pled guilty to this case take the 5 years, so I won't have to do the whole 15 years of my back-up probation time.

THE GOVERNMENT: So you felt it was a risk worth taking, even though your testimony indicates today that that gun was not yours, is that right?

APPELLANT: Yes.

THE GOVERNMENT: But to be clear, the testimony you've given today to the grand jurors is truthful and complete and accurate testimony?

APPELLANT: Yes.

J.A. 1694. Following Appellant's testimony on June 15, 2017, the grand jury returned a

superseding indictment against Detective Hersl.

## 2.

On July 5, 2017, after Appellant testified in the grand jury, which testimony the

Government assured the grand jury was "truthful and complete and accurate," J.A. 1694,

the Government filed a motion pursuant to Rule 35 of the Federal Rules of Criminal

Procedure seeking a reduction in Appellant's sentence "in recognition of his substantial

assistance to the Government" in the case against Detective Hersl. J.A. 190. However,

Appellant asked the Government to withdraw its Rule 35 motion because "the risk of retaliation by the police was too high to continue with a Rule 35 motion since the government would not agree to vacate [Appellant's] conviction, but only reduce his sentence when he had relatively little time left to serve." J.A. 158. As a result, the Government withdrew the motion.

3.

Ultimately, on February 13, 2018, a jury found Detective Hersl guilty of racketeering, Hobbs Act robbery, and extortion. Specifically, the jury found that Detective Hersl (1) stole thousands of dollars while arresting Jimmie Griffin in November 2014; (2) planted drugs on Herbert Tate in order to steal money from him and cover up his and the other officers' misconduct on November 27, 2015; (3) robbed Antonio Santiful on November 28, 2015; and (4) targeted Ronald Hamilton on July 8, 2016, entered his house without a warrant, and stole $20,000. For his crimes, Detective Hersl was sentenced on June 22, 2018 to 18 years of imprisonment. Detective Hersl's conviction and sentence were affirmed on appeal by this court.

E.

Appellant's § 2255 Petition

On March 12, 2018, Appellant filed a petition pursuant to 28 U.S.C. § 2255 seeking to withdraw his guilty plea and vacate his conviction. He argued that the misconduct of Detective Hersl rendered his guilty plea involuntary, and consequently, he should be permitted to withdraw it. In analyzing Appellant's § 2255 petition, the district court concluded that Appellant did not present evidence of egregious misconduct on behalf of

11

the Government sufficient to justify allowing Appellant to withdraw his guilty plea. Specifically, the district court found, "[O]nly one evidence of misconduct by [Detective] Hersl occurred before [Appellant]'s arrest," and this misconduct would constitute impeachment evidence and was disclosed to Appellant before he pled guilty via the IAD files that Appellant requested.   J.A. 1971.  Consequently, the district court denied Appellant's petition.  Further, although Appellant requested discovery and an evidentiary hearing on his petition, the district court dismissed Appellant's petition on the merits and did not allow Appellant discovery or an evidentiary hearing.

Appellant timely appealed, asking this court to reverse the district court's denial of his petition, or alternatively, to vacate the district court's holding and remand to the district court for discovery and an evidentiary hearing.

## II.

"In reviewing a ruling on a motion to vacate a plea under Section 2255, we review a district court's legal conclusions de novo and its findings of fact for clear error." *United States v. Fisher*, 711 F.3d 460, 464 (4th Cir. 2013).  "When, as here, the district court denies relief without an evidentiary hearing, we construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020).

## III.

### A.

Guilty Plea

 "Guilty pleas 'are important components of this country's criminal justice system,' and in order to realize 'the advantages that they provide to all concerned,' guilty pleas must

12

be 'accorded a great measure of finality.'" *United States v. Akande*, 956 F.3d 257, 265 (4th Cir. 2020) (quoting *Christian v. Ballard*, 792 F.3d 427, 444 (4th Cir. 2015)).  But, "'to be constitutionally valid, a plea of guilty must be knowingly and voluntarily made.'" *United States v. Fisher*, 711 F.3d 460, 462 (4th Cir. 2013) (quoting *United States v. Brown*, 117 F.3d 471, 473 (11th Cir. 1997)).  "And 'a guilty plea is not knowingly and voluntarily made when the defendant has been misinformed' as to a crucial aspect of his case."  *Id.*

"[A] defendant's solemn declarations in open court affirming [a plea] agreement [] 'carry a strong presumption of verity.'" *United States v. White*, 366 F.3d 291, 295 (4th Cir. 2004) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  "Indeed, because they do carry such a presumption, [guilty pleas] present 'a formidable barrier in any subsequent collateral proceedings.'" *White*, 366 F.3d at 295–96 (quoting *Blackledge*, 431 U.S. at 71). But, as the Supreme Court held in *Blackledge*, even when a defendant swears to a plea in open court, that plea is not categorically immunized from collateral attack.  431 U.S. at 72–73; *see White*, 366 F.3d at 296.  That is, "the barrier of the plea or sentencing proceeding record, although imposing, is not invariably insurmountable." *Blackledge*, 431 U.S. at 74. Nevertheless, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *United States v. Lemaster*, 403 F.3d 216, 221–22 (4th Cir. 2005).

B.

United States v. Fisher

In *United States v. Fisher*, we considered whether a defendant's guilty plea should be vacated pursuant to § 2255 where the defendant pled guilty without knowledge that an officer had lied on the affidavit supporting the search warrant that uncovered the only evidence against the defendant. 711 F.3d 460, 462–64 (4th Cir. 2013). There, we held:

> [T]o set aside a plea as involuntary, a defendant who was fully aware of the direct consequences of the plea must show that (1) some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea and (2) the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.

*Id.* at 465 (internal quotation marks omitted) (citations omitted). "The Supreme Court has held that government misrepresentations constitute impermissible conduct." *Fisher*, 711 F.3d at 465 (citing *Brady v. United States*, 397 U.S. 742, 755 (1970)). But we emphasized in *Fisher* that it was not proper to allow a defendant to withdraw a plea "'merely because he discover[ed] long after the plea ha[d] been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action.'" *Fisher*, 711 F.3d at 466 (quoting *Brady*, 397 U.S. at 757) (alterations in original). Rather, the defendant's reliance on a misrepresentation by the Government must "strike[] at the integrity of the prosecution as a whole." *Fisher*, 711 F.3d at 466 (internal quotation marks omitted) (citation omitted).

Importantly, we held in *Fisher* that a defendant need not make a claim of actual innocence in arguing that his plea was not knowingly and voluntarily made. *Fisher*, 711

F.3d at 467. "Instead, in assessing the validity of a defendant's plea, courts look to 'all of the relevant circumstances surrounding' the plea." *Id.* (quoting *Brady*, 397 U.S. at 749). If a defendant can show that there was egregiously impermissible conduct involved in his prosecution, he must next show that this misconduct influenced his decision to plead guilty. *See Fisher*, 711 F.3d at 467. That is, a defendant "must show that a reasonable defendant standing in his shoes likely would have altered his decision to plead guilty, had he known about [the] misconduct." *Id.* We also noted that the standard "is not whether the defendant undoubtedly would have prevailed" in taking a different course of action in the district court, but "whether there is a *reasonable probability* that he would not have plead guilty, had he known of the impermissible government conduct." *Id.* at 468 (emphasis supplied) (internal quotation marks omitted).

Finally, we concluded *Fisher* by explaining that the decision was "supported by the important interest of deterring police misconduct" because allowing a guilty plea to stand in the face of such misconduct would "undermine[] public confidence in our judicial system." *Fisher*, 711 F.3d at 469–70.

C.

Competing Versions of the Truth

This case presents the extraordinary circumstance in which the Government has taken antithetical stances supporting two completely different versions of the truth relative to Appellant's offense of conviction. But, there cannot be two sides to the truth. The truth is the truth. Nonetheless, in this case the Government proffers two versions.

In 2015, Appellant pled guilty to being a felon in possession of a firearm. At Appellant's plea hearing, the Government attorney -- an officer of the court -- averred that Appellant was, in fact, guilty of possessing a firearm. Specifically, the Government told the court:

> When he reached the porch of 651 Bartlett Avenue, his residence, Mr. Paylor withdrew from his waistband a Heckler & Koch .45 caliber pistol bearing Serial Number 2509021. The pistol was loaded with nine rounds, one of which was in the chamber. After withdrawing the pistol from his waistband, Mr. Paylor placed it underneath a seat cushion on his front porch, where it was late[r] recovered by law enforcement.

J.A. 49. Yet, before the 2017 grand jury, the Government made an about face and -- again under oath -- offered Appellant's testimony that the officers involved in his arrest planted the firearm and stole money from him. In doing so, the Government offered Appellant's account of his arrest as evidence of Detective Hersl's corruption. In front of the grand jury, the Government -- through Appellant's testimony -- explicitly disavowed Appellant's plea agreement. *See* J.A. 1694–95 (THE GOVERNMENT: "But to be clear, the testimony you've given today to the grand jurors is truthful and complete and accurate testimony?" APPELLANT: "Yes."). Indeed, the Government was so supportive of Appellant's grand jury testimony that it went so far as to move the court pursuant to Rule 35 for a substantial reduction of Appellant's sentence. In making a Rule 35 motion on Appellant's behalf, the Government certified that the information Appellant provided was helpful and *accurate*. Historically, Rule 35 motions are quite rare. While there were approximately 1.5 million people incarcerated in federal prisons in 2014, the Government made only 1,645 Rule 35 motions that year. *See Prisoners in 2014*, E. Ann Carson, Bureau of Justice Statistics,

September 2015, https://perma.cc/S5S2-WXC9; *The Use of Federal Rule of Criminal Procedure 35(b)*, United States Sentencing Commission, January 2016, https://perma.cc/Z5RE-PUFP. Between 2009 and 2014, the United States Sentencing Commission found that the Government made between 1,611 and 2,092 motions each year. *See The Use of Federal Rule of Criminal Procedure 35(b).*

But now that Appellant seeks to have the same conviction vacated, the Government claims that Appellant's original plea -- the same plea the Government disavowed in prosecuting Detective Hersl -- is, in fact, accurate. What? The Government cannot have it both ways. There is only one truth.

In attempt to support its shifting position, at oral argument the Government contended, "The record shows that, with one exception, every known instance of criminal misconduct by [Detective] Hersl happened after [Appellant]'s guilty plea." *See* Oral Argument at 13:04–12, *United States v. Paylor*, No. 19-7861 (4th Cir. Mar. 12, 2021), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. Let's test that statement.

Appellant pled guilty on April 21, 2015. Significantly, however, at Detective Hersl's trial, in which the *first charged count of robbery occurred in 2014*, the Government argued that Detective Hersl's misconduct and modus operandi had been occurring *years prior* to that 2014 robbery. In fact, in its closing argument during Detective Hersl's trial, the Government argued that Detective Hersl's misconduct began "*prior to 2014*." J.A. 1718 (emphasis supplied). And at Detective Hersl's sentencing, in support of the long term and widespread nature of Detective Hersl's misconduct, the Government stated, "The most

recent numbers [of misconduct] offered to City Council are that 1700 cases have been affected." J.A. 1733. It is quite a stretch to think that Detective Hersl would have been able to acquire so many tainted convictions between 2014 -- when the first indicted crime occurred -- and 2017 -- when Detective Hersl was removed from the Gun Trace Task Force ("GTTF")[2].

Moreover, the Government specifically argued in its closing argument at the trial and conviction of Detective Hersl, "What investigators learned, to their surprise, was when they looked at Defendant Hersl's conduct before he joined the GTTF, he was also robbing civilians in the previous unit he served with." *Id.* at 1715. While the record is not clear exactly when Detective Hersl joined the GTTF, the indictment against Detective Hersl alleges that he "was assigned to the GTTF not later than April 28, 2016." *Id.* at 1142.

The Government's two-faced positions and contrary statements before the court are clearly at odds with the notion of justice. When a party changes position in front of the court, its "previous position undermines the credibility of [its] current argument." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012). This is particularly amplified when that party is the Government, whose role is to assure that justice is done.

---

[2] The GTTF is a section of the Baltimore Police Department, now infamous for the corruption which Detective Hersl's trial exposed. The indictment in Detective Hersl's case charged him and six other officers on the GTTF with various acts of robbery and corruption. In total, at least 13 officers were convicted on charges related to the GTTF's corruption and violence against citizens. *See Anatomy of the Gun Trace Task Force Scandal: Its Origins, Causes, and Consequences,* January 2022, https://perma.cc/KQL7-79P2.

D.

Timing of Evidence

Here, Appellant contends that the conviction of Detective Hersl and the evidence of misconduct he engaged in, coupled with the allegations of misconduct Appellant has consistently made, are sufficient for us to reverse the district court and grant his § 2255 petition. In response, the Government argues that Appellant has not presented sufficient evidence of misconduct on the part of former Detective Hersl that predated Appellant's guilty plea.[3] Accordingly, the Government argues, Appellant did not meet the *Fisher* standard in order to demonstrate that his plea was not knowing and voluntary.

To start, we consider the Government's argument that, thus far, Appellant has not produced sufficient evidence of Detective Hersl's misconduct that predated Appellant's guilty plea such that his plea should be vacated. In *Fisher*, the relevant misconduct that rendered the defendant's plea involuntary occurred *before* the defendant pled guilty. *See* 711 F.3d at 466–67. Here, the Government contends that the information about Detective Hersl's misconduct that Appellant claims is relevant occurred *after* Appellant's arrest and plea. Namely, such evidence includes the jury verdict finding Detective Hersl guilty of

---

[3] The Government also attempts to rely on an interview with Appellant's stepfather, Stewart Harris, that occurred in March 2018. Harris was at home during Appellant's arrest, and in the interview, his version of Appellant's arrest corroborated the officers' accounts. The Government argues that Appellant's petition should not be granted on this basis. But the Government's continued reliance on the interview with Harris misses the mark on this distinction. *Fisher* is clear: Appellant does not need to bring a claim of actual innocence in order to prevail on his § 2255 petition. Rather, he only needs to demonstrate that egregious misconduct materially influenced his plea.

19

robbing Jimmie Griffin in November 2014; Herbert Tate in November 2015; Antonio Santiful in November 2015; and Ronald and Nancy Hamilton in July 2016. Of those, only the Griffin robbery occurred prior to Appellant's April 2015 guilty plea, and Appellant had access to the IAD complaint regarding this incident before his guilty plea.

We agree with the Government that, pursuant to *Fisher*, the relevant misconduct must have occurred prior to Appellant's guilty plea. *Fisher*'s mandate requires that the misconduct impacting the guilty plea goes to "the integrity of the prosecution as a whole," *Fisher*, 711 F.3d at 466 (citations omitted), and consequently, we cannot consider whether a defendant with knowledge of events that occurred *after* his case would have made a different decision with regard to his guilty plea. To hold otherwise would undercut the finality of the guilty plea. But, the inquiry does not end there.

E.

Evidence Currently on Record in this Petition

As it currently stands, the only direct evidence of Detective Hersl's misconduct that occurred prior to Appellant's guilty plea that is a part of the record in this case is Detective Hersl's conviction for the robbery of Jimmie Griffin in 2014. To be sure, this conviction is not insignificant. Detective Hersl's robbery of Griffin shares striking similarities to Appellant's claims here. Griffin testified at Detective Hersl's trial that Detective Hersl took $6,000 from Griffin at the time of his arrest but reported that he recovered only $900. However, as the district court noted, one of the four and a half IAD complaints that Appellant had access to before his guilty plea involved Griffin's allegations against Detective Hersl. Thus, evidence relating to the Griffin robbery alone cannot support

20

Appellant's claim under *Fisher* that "egregiously impermissible conduct" about which he did not have access "influenced his decision to plead guilty." 711 F.3d at 465. Consequently, we decline to reverse the district court's denial of Appellant's § 2255 petition at this point.

But, crucially, this does not end our analysis. This is because Appellant has not yet been afforded the opportunity for discovery or an evidentiary hearing so as to produce the type of evidence necessary to demonstrate that the officers engaged in "egregiously impermissible conduct" in this case.

IV.

A.

Evidentiary Hearing Standard of Review

We review the district court's denial of an evidentiary hearing or authorization of discovery for abuse of discretion. *See Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015); *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006). Because the district court did not hold an evidentiary hearing in this case, "'we must evaluate the petition under the standards governing motions to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Accordingly, we are obliged to accept a petitioner's well-pleaded allegations as true, and we are to draw all reasonable inferences therefrom in the petitioner's favor.'" *Gordon*, 780 F.3d at 204 (quoting *Conaway*, 453 F.3d at 582); *see also Akande*, 956 F.3d at 261.

In considering Appellant's request for discovery and an evidentiary hearing, "[u]nless the motion and the files and records of the case conclusively [demonstrate] that

21

the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b); *see United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see also Fontaine v. United States*, 411 U.S. 213, 215 (1973) (per curiam) ("It is [] clear that [Section] 2255 calls for a hearing on . . . allegations [of a coerced plea] unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." (internal quotation marks omitted)).  When considering a § 2255 petition, a court first "must determine whether the petitioner's allegations, when viewed against the record of the Rule 11 plea hearing, were so palpably incredible, so patently frivolous or false as to warrant summary dismissal. Only if a petitioner's allegations can be so characterized can they be summarily dismissed." *United States v. White*, 366 F.3d 291, 296–97 (4th Cir. 2004) (internal quotation marks and citations omitted) (cleaned up).

## B.

### Appellant's Petition

As discussed above, Appellant has not yet produced sufficient evidence in the record to demonstrate that there were occurrences of misconduct by Detective Hersl that predated Appellant's plea such that they would have altered his decision to plead guilty.  But, this was not for lack of trying.  Prior to his decision to plead guilty, Appellant repeatedly and consistently raised red flags about Detective Hersl as a dirty cop and sought records of complaints against Detective Hersl and the other officers in his case.  Although Appellant asked for complaints including "any *allegation* of or involving official misconduct, excessive use of force, false statements, misrepresentations, stealing, misappropriation, or

22

any dishonest act that could, at minimum, affect a fact-finder's evaluation of the credibility of the officer," J.A. 159 (emphasis in original), the district court only granted him access to four and a half complaints against Detective Hersl.  However, as Appellant points out, since the time of his 2015 guilty plea, it has come to light that Detective Hersl's misconduct was far more pervasive than Appellant -- or anyone -- could have known at the time. Indeed, in the course of the 2017 trial that led to Detective Hersl's conviction, the Government argued that Detective Hersl's misconduct dated back several years prior to the indicted conduct of Detective Hersl -- and impacted nearly **1,700 convictions**.  *See* J.A. 1733.  In addition to the Government itself arguing outright that Detective Hersl's misconduct predated the robbery of Jimmie Griffin in 2014, J.A. 1715 ("[W]hen [investigators] looked at Defendant Hersl's conduct before he joined the GTTF, he was also robbing civilians in the previous unit he served with."), it is a far reach to conclude that Detective Hersl amassed 1,700 tainted convictions between 2015 and 2017 -- the time between Appellant's guilty plea and Detective Hersl's removal from the GTTF.  This is strong evidence that Detective Hersl's crime spree pre-dated his alleged misconduct against Appellant in this case.

As a result, we cannot say that the record "conclusively shows" that Appellant is entitled to no relief.  Accordingly, we vacate the order of the district court and remand for discovery and an evidentiary hearing.

V.

For the foregoing reasons, the district court's dismissal of Appellant's § 2255 petition is vacated, and we remand to the district court for discovery and an evidentiary hearing.

*VACATED AND REMANDED*